# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JOSEPH PASSAFIUME, ) | CASE NO. 1:12-cv-0795 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | NANCY A. VECCHIARELLI |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | MEMORANDUM OF OPINION |
| Defendant. ) | AND ORDER |
| ) | |

This case is before the magistrate judge by consent. Plaintiff, Joseph Passafiume ("Passafiume"), challenges the final decision of the Commissioner of Social Security ("Commissioner") denying Passafiume's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons given below, the court **AFFIRMS** the decision of the Commissioner.

## I. Procedural History

Passafiume filed an application for DIB and SSI on August 6, 2006, alleging disability as of January 1, 2006. The Commissioner denied Passafiume's application initially and upon reconsideration. Passafiume timely requested an administrative

hearing.

Administrative Law Judge John D. Sullivan ("ALJ") held a hearing on August 4, 2010 at which Passafiume, represented by counsel, testified. Byron Pettingill testified as a vocational expert ("VE"). The ALJ issued a decision on September 1, 2010, in which he determined that Passafiume is not disabled. Passafiume requested a review of the ALJ's decision by the Appeals Council. When the Appeals Council declined further review on February 8, 2012, the ALJ's decision became the final decision of the Commissioner.

Passafiume filed an appeal to this court on April 1, 2012. Passafiume alleges that the ALJ's decision is not supported by substantial evidence because (1) the ALJ failed to consider the statement of a treating physician timely submitted before the ALJ issued his decision; and (2) the ALJ failed to perform a proper analysis of Passafiume's credibility. The Commissioner denies that the ALJ erred.

## II. Evidence

*A.  Personal and Vocational Evidence*

Passafiume was born on January 23, 1966 and was 39 years old on the date of alleged onset of disability. Passafiume alleges disability from damaged left knee, herniated discs, and heart disease. He has a high school diploma and past relevant work as a spray painter, mailroom clerk, and delivery driver.

*B.  Medical Evidence*

On January 9, 2006, Passafiume reported to the emergency room at Lakewood Hospital after vomiting blood following heavy drinking. Tr. at 205-36. He was discharged on January 12, 2006 after being treated for a Mallory-Weiss tear, hepatitis

2

C, and alcohol and nicotine withdrawal.

Passafiume was treated at the Family Medical Center on June 28, 2006, suffering from sweating and tremors resulting from alcohol withdrawal.  Tr. at 239.  He was assessed as positive for high risk sexual exposure, alcoholism/drug abuse, a history of gastrointestinal bleeding, hepatitis C, and acute alcohol withdrawal.

Passafiume's left knee was x-rayed on August 15, 2007.  Tr. at 255.  The x-ray revealed multiple metallic fragments, consistent with bullet fragments, in the soft tissues surrounding the knee; three orthopedic screws traversing a healed left femoral condylar fracture; and possible degenerative and healing changes.  There were hypertrophic changes in the knee with some joint space narrowing.  There was no suprapatellar effusion.  The assessment was degenerative changes in the left knee with chronic changes related to a prior gunshot wound.

Passafiume was admitted to the emergency room at MetroHealth Hospital on January 16, 2008 complaining of constant chest pressure and pain on the right side that radiated into his back.  Tr. at 257-72.  The treating physician placed him on alcohol withdrawal protocol and ordered a stress nuclear test.  The test revealed an ejection fraction of 45% with abnormal left ventricle systolic function.  The attending physician diagnosed Passafiume as suffering from non-ischemic tachycardia due to alcohol and possibly hypertension.  Passafiume was treated with Lopressor, nitroglycerin, and a morphine IV.

On August 11, 2008, Passafiume visited the Medical Care Clinic at MetroHealth Hospital complaining of left knee pain.  Tr. at 273-74.  He was then taking Metopropol and Lisinopril.  Dr. Bobby Golbaba noted a history of hypertension, hepatitis C, alcoholic

cardiomyopathy, and alcoholism in remission. Passafiume reported knee pain, especially with knee extension, and problems with the knee giving out or locking up at random intervals. Dr. Golbaba found the knee to be stable; without warmness, swelling, redness, or effusion; and with 90 degrees of flexion but pain upon 180 degrees of extension. He diagnosed Passafiume as suffering from osteoarthritis in his lower leg, alcoholic cardiomyopathy, and benign hypertension.

Passafiume was examined by orthopedist Daniel L. Master on August 8, 2008. Tr. at 288-90. Passafiume reported pain and spasm in his left knee and weakness in the knee relative to the right knee, but denied numbness or tingling. Passafiume also reported left side paraspinal lumbar pain and intermittent pain radiating from the lumbar back to his right thigh. Passafiume attributed his back problems to a work-related injury many years earlier. He reported that radiographs had been taken at the time and surgery recommended, but he had declined surgery. Dr. Master found pain upon straight leg raise with thigh flexed to 30 degrees, with the pain radiating from the lumbar spine into the right thigh. Dr. Master recommended that the left knee bear weight as tolerated, with elevation of the leg when Passafiume was in a bed or chair. He prescribed physical therapy for the knee with stretching and strengthening. He also prescribed six weeks of physical therapy at back school, followed by a follow-up at the orthopedic spine clinic, including radiographs of the lumbar spine.

Radiographs of Passafiume's lumbar spine on October 3, 2008 revealed disc space narrowing at L3-4, L4-5, and L5-S1. Tr. at 291. There was moderate spurring throughout the lumbar spine, most notably at L2-3, and narrowing and sclerosis of the facet joints in the mid and lower lumbar spine. There was no compression fracture,

bone destruction, or subluxation.  The physician's impression was degenerative disc disease, including osteoarthritic changes involving the facet joints in the mid and lower lumbar spine.  Radiographs of the cervical spine taken the same day revealed a straightening of the normal spinal curvature; disc space narrowing at C2-3, C5-6, and C6-7; extensive spurring throughout the cervical spine; and a small ossicle along the posteroinferior aspect of the spinous process of C2, possibly a post remote avulsion fracture.  The physician's impression was fairly prominent degenerative disc disease with a possible small avulsion fracture involving the spinous process of C2.

On October 6, 2008, Leslie Green, M.D., reviewed Passafiume's medical file and completed a Physical Residual Functional Capacity Assessment.  Tr. at 294-301.  Dr. Green opined that Passafiume could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about six hours in an eight-hour workday, sit  about six hours in an eight-hour workday, and was unlimited in his ability to push or pull.  She further stated that Passafiume could frequently stoop and crouch; occasionally climb ramps and stairs, kneel, and crawl; and could never climb ladders, ropes, and scaffolds.  She also opined that his allegations were generally credible.  In explaining the evidence supporting these limitations, Dr. Green cited Passafiume's allegations of knee injury, herniated discs, and heart attack.  She also noted that when Passafiume was treated for cardiac trouble in January 2008, cardiac enzymes were negative, there was no stress-induced ischemia, that his ejection fraction was 45% with abnormal left ventrical systolic function, his cardiomyopathy was secondary to alcohol abuse and possible hypertension, there had been no further cardiac complaints since Passafiume had stopped abusing alcohol, and his cardiac examination in August 2008 had been

negative. She also noted Dr. Master's findings and conclusions regarding Passafiume's left knee.

From October 14, 2008 through December 23, 2008, Passafiume underwent physical therapy with Surekha Shah. Tr. at 302-48. At the first session, Passafiume estimated knee and lower back pain at six on a ten-point scale, exhibited 74 degrees of flexion in his left knee with pain at the extreme range, and crepitated in the left knee. Passafiume reported difficulty walking and standing for more than a short period and climbing stairs with effort by using non-alternating steps. Shah set goals of decreasing pain by 25% to allow short periods of standing and walking without pain, improve left knee range of motion by 5 degrees, improve left knee strength to preclude the knee giving way, improve his Owestry scale from a score of 26/50 (indicating severe disability) to a score of 20/50 (moderate disability), and greater independence, including use of a straight cane. Shah's prognosis for significant knee improvement was poor, given the age of the injury, but he thought fair back improvement was possible. Passafiume missed sessions several times early in his therapy regimen. By December 23, 2008, Passafiume had achieved goals of decreasing pain by 25%, increasing flexion by 5 degrees, increasing left knee strength so that knee did not give way, and increased independence with the use of a cane. Passafiume did not achieve the goal of a 20/50 Owestry score, although he did achieve a score of 21/50. Despite modest improvement, Passafiume still reported pain at five on a ten-point scale and reported pain radiating into his hip and leg.

On November 19, 2009, Passafiume visited cardiologist David Schnell. Tr. at 357-59. Dr. Schnell noted that Passafiume was no longer drinking and no longer

6

reporting chest discomfort. Passafiume's ejection fraction had improved to 50%, but there was still some left ventricle abnormality that prompted Dr. Schnell to order additional tests. Dr. Schnell's assessment was alcoholic cardiomyopathy with a possible contribution from hypertension; benign hypertension; non-active chest discomfort; emphysema; hepatitis C; some basal scarring; and chronic lumbar pain. Dr. Schness urged complete smoking cessation, recommended a low cholesterol diet, and increased Passafiume's medication for hypertension.

On January 26, 2009, Phillip Bentley, M.D., reviewed Passafiume's medical file and completed a Physical Residual Functional Capacity Assessment. Tr. at 349-56. Dr. Bently opined that Passafiume could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was unlimited in his ability to push or pull. He further stated that Passafiume could occasionally climb ramps and stairs, balance, stoop, and crouch and could never climb ladders, ropes, and scaffolds, kneel, or crawl. In explaining the evidence supporting these limitations, Dr. Bentley recited many of the facts recited earlier by Dr. Green. In addition, he noted recently-detected degenerative changes in Passafiume's lumbar and cervical spines, limited range of motion, and progress notes from physical therapy.

On February 7, 2009, Passafiume visited Dr. Christopher Walker at the Medical Care Clinic. Tr. at 275-77. Dr. Walker noted that Passafiume had experienced no further cardiac episodes since quitting alcohol and also noted that his ejection fraction was 40%. Passafiume reported that he was currently smoking two packs of cigarettes a day.

7

On August 11, 2009, Passafiume visited Northcoast Health Ministry complaining of leg pain rated eight on a ten-point scale.  Tr. at 367-68.  According to Passafiume, he had been using a leg brace but lost it.  As a result, his leg was "giving out" on him.  He also reported that he could not afford all of his prescribed medications and was not, therefore, taking his prescribed Amlodipine.  Passafiume was fitted for a new knee brace and prescribed Celebrex.

On February 22, 2010, Passafiume visited Lakewood Hospital complaining of pain in his back and legs for the previous week.  Tr. at 370-80, 283-86.  Passafiume began experiencing this pain, leg weakness, and numbness after bowling, and he had suffered five falls during this period.  He reported pain upon motion in his lower back and had trouble walking.  Radiography revealed several central disc protrusions causing moderate spinal canal stenosis.  He was prescribed Tramadol and a Medrol Dose Pack and released to follow up with Phillip E. Tomsik, M.D.

On February 23, 2010, Passafiume returned to Northcoast Health Ministry complaining of right leg pain of eight on a ten-point scale.  Tr. at 381-82.  Passafiume also reported numbness, difficulty going down stairs, and that his right leg "gives out" without warning.  He had normal reflexes in his patella bilaterally and had mild tenderness in his lower back.  He was given Tramadol and Neurontin and referred to pain management.

On August 3, 2010, Dr. Tomsik, completed a Medical Source Statement: Patient's Physical Capacity.  Tr. at 393-94.  Dr. Tomsik opined that Passafiume could lift 20 pounds occasionally and 10 pounds frequently, could stand and walk two to three hours in an eight-hour day and stand or walk less than one hour without interruption,

could sit three to four hours in an eight-hour day and sit less than one hour without interruption, could occasionally balance, and could never or rarely climb, stoop, crouch, kneel, or crawl. Dr. Tomsik also opined that Passafiume could rarely or never push or pull; could frequently reach, handle, feel, and engage in fine or gross manipulation; and must avoid temperature extremes, chemicals, dust, moise, and fumes. Finally, Dr. Tomsik stated that Passafiume needed an at-will sit/stand option, would require rest periods beyond lunch and mid-shift breaks, experienced moderate pain, and would experience frequent falls and pain exacerbation during the work day.

C. *Hearing Testimony*

At the August 4, 2010 hearing, Passafiume testified that due to his knee surgery, he lost 25% of the movement in his left knee and cannot stand on it for any length of time due to excruciating pain. Tr. at 40. According to Passafiume, compensating for his knee problems causes his back to hurt because of his disc herniations. Tr. at 40-41. He also stated that sitting or standing for too long or any bending aggravates his back pain, and then he must change position to relieve the pain. Tr. at 41, 44. Moreover, Passafiume said, because of his history of alcoholism, doctors are reluctant to give him pain medications too freely for fear of creating addiction. Tr. at 41. As a result, he is in fairly constant pain of about an eight on a ten-point scale, including pain that interferes with his sleep. Tr. at 41-42. Passafiume also told the court that, in addition, his knee sometimes gives way and causes him to fall, which is why he must walk with a cane. Tr. at 43.

Passafiume also testified that physical therapy did little to increase his mobility or decrease pain. Tr. at 41. According to Passafiume, he must sit and elevate his legs to

9

relieve pain at least four to six times a day.  Tr. at 42.

Passafiume has not been having any symptoms of heart trouble recently.  Tr. at 45.  He testified that the medications help, although he remains short of breath.  Tr. at 45.  He reported that he had recently quit smoking and that his wind was better as a result.  Tr. at 48.

Passafiume also testified that he could lift up to ten pounds, the approximate weight of a full laundry basket.  Tr. at 47.  He told the court that he did a little bit of house chores, dishes, and laundry.  Tr. at 47.

The VE testified that Passafiume's past relevant work included work as a painter, mailroom clerk, and delivery driver.  Tr. at 50-51.  The ALJ asked the VE to suppose an individual capable of light work and having the same age, education, and work experience as Passafiume.  Tr. at 51-52.  The supposed individual had to use a cane or crutch for ambulation; could only occasionally balance and climb stairs; must avoid crouching, crawling, climbing ropes and ladders, climbing scaffolding, kneeling, or stooping; must avoid moderate exposure to fumes, odors, dust, gases, and poor ventilation; must completely avoid temperature extremes.  When the ALJ asked the VE if such an individual was capable of performing any of Passafiume's past relevant work, the VE testified that the individual could perform the job of mailroom clerk.  Tr. at 52.  The VE also testified that such an individual could perform the jobs of office helper, small products assembler, and electronics worker.  Tr, at 53-54.

The ALJ then restricted the previous hypothetical individual to sedentary work and asked the VE is there would be work for such an individual.  The VE testified that such an individual could perform the jobs of order clerk and final assembler.  Tr. at 54-

55.

The VE also testified that employers hiring for the jobs described above would tolerate no more than two absences per month, would give a 30-45 minute lunch break plus mid-morning and mid-afternoon breaks of about 15 minutes, and would have to remain on-task about 80% of the time.  Tr. at 55-56.  The VE also testified that employers generally would not allow an employee to elevate feet above about stool level.  Tr. at 56-57.

At the end of the hearing, the ALJ told Passafiume that he had not made a decision yet and, when he did, he would be writing that decision.  The ALJ did not explicitly close the record, and Passafiume's counsel did not ask the ALJ to keep the record open or indicate that any evidence was missing.  Tr. at 57.  Six days after the hearing, Passafiume submitted to the ALJ Dr. Tomsik's Medical Source Statement: Patient's Physical Capacity form, completed on August 3, 2010.  *See* tr. at 392-97.  The cover letter apologized for the late submission and explained that the Statement had only been brought to the attorney's attention after the hearing.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain

income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent his from doing his past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent his from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining on September 1, 2010 that Passafiume was not disabled, the ALJ made the following relevant findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2. The claimant has not engaged in substantial gainful activity since January 1, 2006, the alleged onset date.

3. The claimant has the following severe impairments: Hepatitis C,

        degenerative joint disease of the left knee, discogenic and degenerative disorders of the spine, emphysema, coronary artery disease.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except limited to occupations which can be performed with the use of a cane for ambulation, and occasional balancing, and no climbing, stooping, balancing, crouching, kneeling and crawling. He requires the option to sit or stand at will, and avoid even moderate exposure to fumes, dust, odors, gases or poor ventilation.  He must avoid concentrated exposure to hot or cold temperature extremes.  He can perform work with customarily expected breaks and absences.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on January 23, 1966 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act from January 1, 2006, through the date of this decision.

Tr. at 13-27.  The ALJ did not reference Dr. Tomsik's Medical Source Statement in his opinion.

        On March 1, 2011, August 5, 2011, August 26, 2011, and October 4, 2011,

Passafiume submitted additional evidence to the Commissioner.  *See* tr. at 428-33, 405-27, 398-404, and 435-86, respectively.  This additional documentation, along with Dr. Tomsik's Medical Source Statement, was added to the record and considered by the Appeals Counsel in denying review.  *See* tr. at 1-5.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

### VI.  Analysis

Passafiume alleges that the ALJ's decision is not supported by substantial evidence because (1) the ALJ failed to consider the statement of a treating physician timely submitted before the ALJ issued his decision; and (2) the ALJ failed to perform a proper analysis of Passafiume's credibility.  The Commissioner denies that the ALJ erred.

*A.     Whether the ALJ erred by failing to consider the opinion of a treating physician*

Passafiume contends that the ALJ erred because Passafiume timely submitted to the ALJ after the hearing the opinion of Dr. Tesik, but the ALJ failed to consider that opinion in his decision.  According to Passafiume, his counsel faxed the opinion of Dr. Tesik to the ALJ six days after the hearing.  The Commissioner implies that this is not true: "Plaintiff submits that she [sic] faxed Dr. Tomsik's medical source statement . . . six days after the hearing.  However, it is apparent from the ALJ's decision and his attached exhibit list that he did not have this evidence before him when he issued his decision."  Defendant's Brief at 11-12 (citations omitted).  The Commissioner adds that Passafiume gave no indication at the hearing that any evidence was missing from the record, did not indicate that the ALJ should expect additional evidentiary submissions, and did not even mention Dr. Tomsik's name during the hearing.

It is clear that the ALJ did not consider the opinion of Dr. Tomsik in writing his opinion.  The opinion notes, "As far as opinion evidence, none of the claimant's physicians have offered an assessment of his functional limitations."  Tr. at 21.  Dr. Tomsik was a treating physician, and his Medical Source Statement included a summary of Dr. Tomsik's opinions regarding Passafiume's functional limitations.  In addition, Dr. Tomsik's opinion is included in the record as Exhibit 19F, and the ALJ's decision references only Exhibits 1A through 17F.  *See* tr. at 24-27.  The issue, then, is whether failing to consider Dr. Tomsik's opinion was error.

The Social Security regulations describe procedures for submitting evidence after the ALJ has conducted a hearing:

> (a)  You should submit with you request for hearing any evidence that you have available to you.  Any written evidence that you wish to be considered at the hearing must be submitted no later than five business days before the date of

15

> the scheduled hearing. If you do not comply with this requirement, the administrative law judge may decline to consider the evidence unless the circumstances described in paragraphs (b) or (c) of this section apply. . . .
>
> (c)  If you miss the deadline described in paragraph (a) of this section and you wish to submit evidence after the hearing and before the hearing decision is issued, the administrative law judge will accept the evidence if you show that there is a reasonable possibility that the evidence, alone or when considered with the other evidence of the record, would affect the outcome of your claim, and:
> (1) Our action misled you;
> (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from submitting the evidence earlier; or
> (c) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from submitting the evidence earlier.

20 C.F.R. § 405.331(a) and (c) ("§ 405.331").[1]

In submitting Dr. Tomsik's Medical Source Statement to the ALJ, Passafiume's attorney wrote the following:

> I apologize for the late submission of the attached information, however, it was brought to my attention after the hearing. I have attached pictures of Mr. Passafiume's knee when he had taken demonstrating the extent of the damage that was done by his previous surgeries. In addition, I have included a Medical Source Statement regarding his physical ability to do work-related activities. I believe that this assessment is consistent with my argument that Mr. Passafiume cannot sustain work-related activities, especially in light of Dr. Townsend's notations that the claimant has frequent falls, pain, exacerbations, and would need extra breaks.

Tr. at 392.

Arguably, the cover letter to the ALJ demonstrated a reasonable possibility that the evidence, alone or when considered with the other evidence of the record, would affect the outcome of Passafiume's claim. But the letter does not satisfy any of the additional requirements of § 405.331 for submitting evidence after the hearing.

---

[1] Neither Passafiume nor the Commissioner cites § 405.331 or caselaw relying upon that section.

16

Particularly given the fact that Dr. Tomsik was Passafiume's treating physician, Passafiume does not explain why circumstances beyond his control prevented him from submitting such a Medical Source Statement earlier.  Thus, because Passafiume did not meet the requirements at § 405.331 in submitting Dr. Tomsik's assessment after the hearing had concluded, the ALJ was not required to consider that assessment in his opinion.  Passafiume's argument to the contrary is not well-taken.

B.      *Whether the ALJ failed properly to analyze Passafiume's credibility*

Passafiume contends that (1) the ALJ's findings related to the ALJ's credibility assessment were inconsistent with the objective medical evidence and Passafiume's testimony and (2) the decision was not sufficiently specific to make clear to reviewers the weight the ALJ gave to Passafiume's statements and the reasons for that weight.  The Commissioner responds that the ALJ decision was consistent with the medical evidence and that the ALJ was not required to accept Passafiume's testimony uncritically.

Credibility determinations regarding a claimant's subjective symptoms rest with the ALJ.  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Nevertheless, social security regulations constrain the ALJ's analysis and determination of a claimant's credibility.  In particular, 20 C.F.R. § 416.929(a) and SSR 96-7p, 1996 WL 374186, describe a two-step process by which an ALJ must proceed in

17

ascertaining the degree to which a claimant's statements about her subjective symptoms are credible.  *See also Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 246-47 (6th Cir. 2007).  First, an ALJ must determine whether the there is an underlying medically determinable physical impairment that could be expected to produce the claimant's alleged symptoms.  20 C.F.R. § 416.929(a); 96-7p, 1996 WL 374186 at *2.  Second, if the ALJ finds that the claimant suffers from an underlying impairment which could produce such symptoms, the ALJ must evaluate the actual intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*  In making this evaluation, the ALJ must consider the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms; and any other factors bearing on claimant's limitations in performing basic functions.

In finding that Passafiume was not entirely credible, the ALJ recited the two-step test that he must apply and then wrote the following:

> After careful consideration of the evidence, the undersigned finds that the claimant's degenerative spine disease, degenerative joint disease, hepatitis C, could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The claimant's treatment history for his knee is extremely sparse and not consistent with the level of discomfort to which he testified.  He saw Dr. Bobby Golbaba, M.D., in August 2008, who observed no warmth, redness, effusion, or instability in this knee.  There was no mention of a brace at this time, and none during his 2008 physical therapy.  However, when he obtained a brace in August 2009, he stated that he had lost the previous brace.  The treatment notes state

> that claimant hadn't been seen in 2 years.
>
> The claimant's allegations of extent [sic] of his back pain are similarly not credible. He has not seen an orthopedic specialist, nor a neurosurgeon. He has not been prescribed steroid injection and is not in a pain management program. Discharge notes from physical therapy, which ended two weeks after the December 15, 2008 session, do not exist in the record. . . .
>
> As for the opinion evidence, none of the claimant's physicians have offered an assessment of his functional limitations. However, the state agency medical consultant determined that the combination of impairments, together with the sparse evidence of limitation, indicated that the claimant can perform work of light exertion, lifting 20 pounds occasionally and 10 pounds frequently. The undersigned took the claimant's testimony into consideration while formulating the residual functional capacity, and finds that the claimant's combined impairments limit him to work of sedentary exertion, with the non-exertional limitations described above.

Tr. at 21.

In making his credibility determination, the ALJ considered Passafiume's testimony, which included Passafiume's daily activities; his allegations regarding the location, duration, frequency, and intensity of symptoms; and factors that precipitate and aggravate symptoms. He also considered the treatment that Passafiume received to alleviate symptoms and other measures to alleviate symptoms. In addition, the ALJ relied on Dr. Bentley's functional capacity assessment.[2]  While the ALJ's analysis is not perfect, as he did not consider Passafiume's medications and their possible side effects, it is, nevertheless, supported by substantial evidence in the record.

Passafiume objects that the credibility assessment was inconsistent with the objective medical evidence and Passafiume's testimony. In support this assertion,

---

[2] The ALJ did not mention Dr. Green's functional capacity assessment in connection with the analysis of Passafiume's credibility. As Dr. Green assessment of Passafiume's RFC was slightly less restrictive than Dr. Bentley's, this was harmless error.

Passafiume cites his own allegations of pain and limitation and reports of Passafiume's allegations of pain as recorded by his therapist.  As the Commissioner points out, the ALJ is not required to take these statements at face value.  Passafiume also refers to x-rays and Dr. Bentley's functional capacity assessment.  But Passafiume does not explain how Dr. Bentley's functional capacity assessment contradicts the ALJ's opinion or cite any medical opinion to support his interpretation of the x-ray results.

The ALj's credibility assessment is supported by substantial evidence, and Passafiume does not demonstrate that it is contradicted by the record or that it is insufficiently specific for review.  Consequently, Passafiume's contention that the ALJ failed properly to analyze Passafiume's credibility is not well-taken.

VII.  Decision

For the reasons described above, the court **AFFIRMS** the decision of the Commissioner.

**IT IS SO ORDERED.**

Date:  November 15, 2012          s/ *Nancy A. Vecchiarelli*
                                  Nancy A. Vecchiarelli
                                  U.S. Magistrate Judge